# Norton D. McKinney v. Georgia H. McKinney Kelley

[141 A2d 660]

September Term, 1957.

Opinion Filed November 5, 1957.

Opinion on Motion for Reargument Filed March 5, 1958.

*Lawrence C. Jones* and *Albert G. Avery* (of New York, N.Y.), Of Counsel, for the petitioner.

**Hulburd, J.** The petitioner seeks under V. S. 47, §3252 to have a custody order modified. The petition was served upon the petitionee in Connecticut, following which she notified the court that she did not care to appear. Accordingly, the case was heard below as an uncontested matter. After hearing the petitioner's evidence, the trial court refused to modify the custody order and dismissed the petition. The case comes here on the petitioner's exceptions to the action of the county court.

Extensive findings were made by the court below. To some of these the petitioner excepted. He also saved many exceptions to the court's refusal to find certain facts as requested. We will briefly summarize those facts found which stand unchallenged by any exception briefed by the petitioner. On July 12, 1940, the petitionee and petitioner were married. The parties had two children: Denman, born January 31, 1942, and Kirk, born Oct. 27, 1944. During June of 1945, the McKinneys came to Middletown Springs, Vermont to live. Here Mr. McKinney, with his wife as partner, engaged in the business of raising animals for sale to laboratories for research purposes. In carrying on this enterprise, the McKinneys needed further help and they employed Kay Francis Kelley to assist them. Some time thereafter an incident occurred concerning which the petitioner introduced evidence resulting in the following finding by the court:

"5. During the month of September or October of the year 1950 Kay Francis Kelley, an employee of the Libellant

and the Libellee, made a business trip with the Libellee to New York and had occasion to stay overnight in a New York state motel. Whether or not said parties occupied the same or separate rooms does not appear in evidence. Upon their return to Middletown Springs the following day the Libellant accused the Libellee of infidelity and the Libellee's reply to said accusation was that "nothing happened at all". * * * * * This particular incident appears to have led to the separation of the Libellant and the Libellee during the month of November, 1950, at which time said Libellee left said Libellant and went to New York City, stayed about a month returning to Middletown Springs for about a week after which she returned to New York.—"

On January 17, 1952, in Rutland County Court the petitioner filed his libel for divorce charging adultery. Thereafter the adultery charge was withdrawn and on February 3, 1953, the petitioner was granted a divorce from the petitionee on the ground of intolerable severity. Custody of the two children was decreed by the court in accordance with a stipulation of the parties. Under it, Denman went to the father, and Kirk to the mother. Kirk has remained with his mother in Connecticut ever since, and it is as to him that the petitioner seeks a change in custody.

On September 21, 1956, the petitionee remarried. It was the second marriage also for her new husband. He was Kay Francis Kelley, the McKinney's former employee. Kelley's first marriage had terminated in a divorce. He had instituted divorce proceedings on November 8, 1955. His wife had filed a cross-complaint, charging desertion; whereupon Kelley withdrew his complaint and a divorce was granted the wife uncontested by Mr. Kelley. Mrs. Kelley was awarded the custody of three infant children and Kelley was directed to pay the sum of $27.00 weekly for their support.

After Kelley and the petitionee were married in 1956, they went to live in Andover, Connecticut, in a home purchased by Mr. Kelley. Kirk had continued with his mother ever since she had separated from her husband in 1950 and went on doing so in the new home. He has come to refer to Mr. Kelley as "father." Both Mr. and Mrs. Kelley are employed: she for

Coca Cola Bottling Company at about $50.00 a week, while he averages to work forty hours per week at an hourly rate of $2.37 per hour.

It is largely in the light of the finding No. 5 which we have quoted that the petitioner claims that the subsequent marriage by the petitionee to Kelley (some six years later) furnishes a compelling reason for changing the custody of Kirk from his mother to the petitioner. Such a result the petitioner claims is further supported by additional facts which he requested the court to find.

Before turning to these requests it might be well to review certain legal principles which are applicable to a problem of this sort.

At the outset it is well settled that in order to warrant the modification of a custody order, a change in conditions or circumstances must be shown. *Buckminster* v. *Buckminster*, 38 Vt 248, 250; *Sand* v. *Sand*, 116 Vt 70, 71, 69 A2d 7. It is equally well settled that it is the welfare of the child which in the last analysis is determinative in a custody matter. *In re Cooke*, 114 Vt 177, 183, 41 A2d 177; *Deyette* v. *Deyette*, 92 Vt 305, 309, 104 A 232, 4 ALR 1115. Bringing the foregoing principles together, it should be apparent that "change of circumstance" is not a "ground" for modification of a custody decree. It is a prerequisite. In other words, to justify the modification of a custody order the petitioner must first show that there has been a change of circumstances, and then go on to show that under the new conditions a change of custody would be for the best interests of the child. Fortunately, in this world not all changes in condition are for the worse; some are for the better, and when a child is thus favored, obviously he should not be unsettled. It is for the trial court to determine whether a change of custody is desirable under the altered circumstances. This determination often involves a balancing of the advantages and disadvantages which would result in granting custody to one or the other of two parents. *Raymond* v. *Raymond*, 120 Vt 87, 95, 132 A2d 427, 431. Thus it becomes a question of judgment and sound discretion, and if the county court does not abuse its discretion in the determination, there

is nothing for this Court to review. 27 CJS p. 1263; *Miller* v. *Miller*, 89 Vt 547, 548, 95 A 928.

Against the background of these legal principles, what are we confronted with here? The petitioner points to the fact that the petitionee has remarried, and this he says furnishes the required change of circumstances. Moreover, he asserts, not only has the petitionee remarried, but that marriage was to the very man with whom the petitionee was carrying on an adulterous relationship while she was still the wife of the petitioner. The findings of the court below do not support this position. No adultery has been found. It is clear that the court was not satisfied that adultery had been committed, even though there was evidence tending to indicate to the contrary. The most that can be claimed for the findings is that the court found that the petitionee, while married to the petitioner, became infatuated with Kelley around 1950, that the petitioner became aware of this infatuation, that it led to trouble between the petitioner and petitionee and a divorce in 1953 and that in 1956 the infatuation culminated in a marriage between the petitionee and Kelley. Although refusing to find that the prior relationship of Kelley and the petitionee was illicit, it did find it to be "unconventional."

In these circumstances did the court below, in refusing to modify the custody order, abuse its discretion? This is a question which we will discuss a little later in the opinion.

Before reaching it, we must first consider the petitioner's requests to find, for the petitioner claims that if the court had properly found all that he requested, his case would have been greatly strengthened and a different ultimate decision would have been dictated.

■■ The requests are twenty-four in number. Almost all are unfortunately long, often containing numerous sentences and several subject matters. The petitioner has proceeded on the theory that every piece of evidence, however trifling, should be solidified into a finding. He has worked with a very fine brush indeed. This is not the purpose of findings of fact. The law does not contemplate that the trial court should re-state the evidence nor report all the subordinate facts.

*Partridge* v. *Cole*, 98 Vt 373, 375, 127 A 653. Moreover, when a request is multiple in character, there is always the risk that some valid element of it may become embedded in other elements which the requesting party is not entitled to have found. As a result the good falls with the bad, for the whole must be supported by the evidence and not merely a part. See 89 CJS §619 at page 441. Most of the petitioner's requests are of this character. This includes Nos. 2, 3, 4, 5, 6, 8, 9, 10, 11, 13, 13, (there are two "13's") 14, 15, 16, 17, 18, 19, 20, 21, 22, 23. Their number and length do not permit us to quote them individually. The remainder have not been briefed and so are waived. After a careful examination of each we find no error in refusing to find as requested. It was for the trial court to interpret and evaluate the evidence and present its resultant findings on the essential elements of the case. There has been no error or omission in this respect.

In addition to taking exceptions to the court's refusal to find, the petitioner has excepted to certain findings as made. The first of these is to the statement of the court in Finding 4 that petitioner "appeared satisfied with his wife and the manner in which she attended to the two minor children"; also in Finding 5 the court stated "this appears to be the only incident"; and further in Finding 20 the court stated that Kirk "is apparently fond of his stepfather, Mr. Kelley." We agree that such statements are not to be treated as proper findings of fact (see *Avery* v. *Bender*, 119 Vt 313, 331, 126 A2d 99) and should be disregarded. However, they furnish nothing indispensable to the overall position taken by the court below and so do not constitute reversible error. We should guard against assuming that rejection of these statements as findings, however, is equivalent to a finding to the opposite effect. Thus, the court's statement that "Kirk appears to be contented", when disregarded, is no finding at all that he is discontented. If that is the fact, the petitioner has failed to establish it.

The trial court found that the petitionee was college-educated, had traveled extensively, and was a very cultured person. The petitioner excepted to so much of the findings as finds the petitionee "a very cultured person" as being "without relevancy in determining her fitness as a custodian in 1957."

No error appears. Having introduced evidence concerning the petitionee's actions before the divorce tending to show her character and possible shortcomings, the petitioner can not properly ask the court to disregard as immaterial all evidence tending to show her desirable qualities and fitness as a mother. Compare *Sullivan* v. *Sullivan*, 141 Conn 235, 104 A2d 898, 899, 901. The same thing applies to an exception to the court's finding: "Mr. McKinney testified and we so find that while the Libellee was not particularly interested in menial housework, however the Libellant, in substance, testified and we so find that he had 'no serious grievance' about anything and, further, that the Libellee was 'a nice wife'. To this point the Libellant appeared satisfied with his wife and the manner in which she attended to the two minor children."

■ The petitioner excepted to finding 6 where the court found that petitionee moved to Glastonbury, Connecticut, with her son in *September* 1951. A reading of the transcript shows that the petitioner was never very clear as to dates in his testimony. It may be that the boy, who had been with his maternal grandmother in Detroit, did not come to his mother until the following January. If there is an error on the matter of dates, it is a trifling one and no basis for upsetting the action of the lower court. *Shaw* v. *Shaw*, 99 Vt 356, 358, 133 A 248.

Petitioner excepted to the trial court's finding (16) that "no competent evidence worthy of belief was introduced indicating any sincere effort on his (petitioner's) part to see the boy" in the last three years. There was evidence that at some time—the transcript does not make clear when—the petitioner wrote to the petitionee proposing that he bring Denman down to see his brother. The petitionee wrote back that the proposed visit would not be convenient. There is no evidence that the petitioner ever made any effort to try another date to see if it would be more convenient. We think this was a matter for the trial court to evaluate on the evidence and we can not say that its finding was unwarranted nor that a complete denial of visitation rights was established as claimed by the petitioner.

The petitioner excepted to findings 20, 21, 22 on the

ground that they were erroneous conclusions of law and that the "second portion" of finding 20 is contrary to the evidence. These three findings read as follows:

"20. Kirk appears to be contented in his present home, is attending school and is apparently fond of his stepfather, Mr. Kelley. No competent evidence was introduced to the contrary nor did the Libellant introduce any evidence indicating that the present home of Kirk is not conducive to his welfare. Since the parties separated in the fall of 1950 the Libellee has had, more or less, constant control and custody of the boy, Kirk.

"21. Mr. McKinney resides at Middletown Springs, Vermont, and as present members of his household there are his uncle, Dr. Norton D. Fletcher, age 80, his aunt, Mrs. Reid, age 81, a housekeeper, Mrs. Lincoln, age 40, and the son, Denman. The doctor who was improved as a witness testified that he is retired, of financial means and will assist in the care and education of Kirk. This, of course, is a pure naked promise without any assurance or financial guarantee unto Kirk.

"22. The Libellant, Norton D. McKinney, at least for the present, is dependent upon the good graces of Dr. Fletcher, his present employment being limited to general charge of the homestead in Middletown Springs and assistance rendered unto Dr. Fletcher as a companion and business advisor or assistant. The extent as well as the limit of the doctor's financial circumstances is unknown to this Court, no evidence thereon having been introduced. No evidence was introduced by the Libellant as to his financial circumstances nor his present earnings or earning capacity. It is apparent to this Court and we so find that no competent or sufficient evidence has been introduced which would lead us to the conclusion that a change or modification of the custodial order, to which the present petition is addressed, would in any way be conducive to the best interest and welfare of Kirk. While the Libellee's conduct since her separation from the Libellant may have been somewhat unconventional her competence as a mother has not been challenged and we find that Kirk is happy, contented and well

cared for in his present home and, having in mind his general welfare, ought not to be disturbed."

In discussing his exceptions to these findings the petitioner devotes most of his briefing to calling our attention to various pieces of evidence which would have supported a different outcome from the one at which the court arrived. We do not hesitate to say that a considerable part of the evidence was favorable to petitioner's contention, but it is also clear that what the court found in findings 20, 21 and 22, and its ultimate conclusion based thereon, are not without support in the evidence. The court finds that no competent evidence was introduced by the petitioner to show that Kirk was not contented in his present home and fond of his stepfather. In fact, in Finding 17 the court finds that when a private detective or investigator called on Kirk at the Kelley home in 1957, the boy asked the investigator the nature of his business and upon learning it, showed his resentment by telling the investigator "to get out of here." This is a sufficient indication that the boy, himself, has no wish to be taken from the custody of his mother and convincing evidence to the contrary was required if the petitioner wished to establish otherwise.

■ As to the "erroneous conclusion of law" ascribed to the court in the final sentence of Finding No. 21, it is enough to say that the mere fact that a finding, or a portion of it, is a conclusion of law is harmless when it is sustained by other facts found which are sufficient in law to support the conclusion. *Schwartz* v. *Avery*, 113 Vt 175, 180, 31 A2d 916. There is nothing in the conclusion objected to which is inconsistent with the other findings.

The petitioner excepted to Finding No. 17 wherein the court found that Kelley's present home is a story and a half bungalow valued "at between $6,000.00 and $7,000.00." The testimony was that it was "worth at approximately $6,000.00."

Any discrepancy between the court's finding and the evidence is "too trivial or unimportant to affect the result" and so unworthy of further consideration. *Shaw v. Shaw*, 99 Vt 356, 358, 133 A 248.

The petitioner excepted to the court's finding as to the

manner that Kelley was dressed on the night of January 23, 1952, when petitionee was present. The finding is supported by the evidence and so is Finding No. 7 that the custody of Kirk by the petitionee "was more or less voluntary on the part of the petitioner." This finding is excepted to although the language used by the court is that of the petitioner in his own petition in this matter. No error appears.

■ Before leaving this group of exceptions, we think we should call attention to a statement in *Miller* v. *Miller*, 89 Vt 547, 549, 95 A 928: "A court or jury is not bound in all circumstances to believe testimony not directly contradicted." We think this holding has particular force and application to the hearing had here where only one side was represented, and where there was no one on hand to challenge any particular assertion. Under such circumstances, the trial court has a broad latitude in determining what evidence is worthy of belief and its findings should be read accordingly.

We now return to a consideration of a question left unanswered earlier in the opinion. Having satisfied ourselves that the findings as they stand represent the situation as the court might properly find it to be, we are ready to consider the ultimate question of whether the refusal of the court to modify the custody order was an abuse of discretion in the circumstances as found.

Doubtless the major circumstance is that the petitionee married—about six years later—the man concerning whom trouble arose during the married life of the petitioner and petitionee. In considering this problem and the petitionee's present circumstances, we must be careful to avoid an assumption of more guilt than has been found. We think it fair to say that Kelley's attentions, whatever they were, broke up the petitioner's home, but to refer to the situation as involving an "adulterous relationship" and "immoral conduct", as the petitioner does, is to get outside the facts as found.

The petitioner has brought to our attention a number of cases bearing on this phase of the matter. The question of custody, to a large extent, must be decided on the circumstances peculiar to the particular situation. It will serve no

purpose, therefore, to undertake an analysis of the various cases cited. A note in 43 ALR2d 264 has collected, and so far as possible, classified the decisions on this subject. It is to be noted that, at times, courts seem to lose sight of the paramount objective, the welfare of the child, and allow it to be obscured by a spirit of retribution.

The court below may well have considered that a parent who knowingly sends his child into conditions which he now says were bad is not one who has displayed such a superiority of character as to suggest that the child's welfare would be safer in his hands. To be sure, the marriage of the petitionee to Kelley represented a change in conditions, but the real question remained: was the change detrimental as far as Kirk's welfare is concerned? The trial court concluded, and we can not say it abused its discretion in so doing, that the change, if anything, represented a change for the better. If conditions, at the time of the divorce, were unstable, they have become stabilized; if they were unconventional, they have become conventionalized. There is no finding, nor evidence, of any irregularity in the petitionee's conduct at the present time. After the crisis had passed and six years had elapsed, the court below came to the conclusion that Kirk "ought not to be disturbed." As was said in *Temple* v. *Atwood*, 99 Vt 434, 435, 134 A 591, 592: "Regardless of what this Court, or some other court, might have done in the circumstances, the record does not show that the discretion of that court was exercised on grounds, or for reasons, clearly untenable, or to an extent clearly unreasonable, which is the recognized test in this State."

In holding as we do, we have not overlooked certain additional grounds for modification claimed by the petitioner, namely: the present financial position of the petitionee; the petitioner's present situation generally; the so-called alienation of Kirk's affection for his father and brother; the visitation difficulties resulting from Kirk being where he is; the differences in religious belief between the petitionee and her second husband. It is enough to say that the claims in connection with the foregoing were not sustained in fact by the findings of the county court, nor can we say that the findings were unjustified on the evidence before it.

For the reasons stated, the judgment order of the county court is *affirmed*.

## On Motion For Reargument

**Hulburd, J.**    The petitioner has moved for reargument. We can well understand that it is difficult for a father to accept a result unfavorable to him in a matter of this sort, especially where he believes it to be at variance with one of our recent decisions.    When this case was first argued, *Raymond* v. *Raymond*, 120 Vt 87, 132 A2d 427, had not been officially reported and it first came to the petitioner's attention from our citation of it in the foregoing opinion.    Having now had a chance to read the Raymond opinion, the petitioner is convinced that the present case is in "direct conflict" with it, and his motion for reargument is based on that ground.    If being in direct conflict means that in the former case the custody of the minor child was awarded to the father, while in the present case the mother's right of custody was upheld, then the petitioner is right.    Because, however, two cases arrived at opposite results, means little until the facts behind them are taken into account.    An examination of the basic facts of the two cases, as found by the trial court, completely undermines the petitioner's position. The Raymond case was a divorce action brought by the husband on the ground of adultery.    It was tried on that ground; the adultery was found, and a divorce was granted because of it.    In connection with the proceeding the father sought custody of the minor child.    The trial court determined that the child's welfare was best served by his being put in his custody instead of that of his mother.    We held that the trial court's determination was amply supported by the evidence.

When we turn to the present case, we are confronted with a situation of an entirely different character.    Here, the petitioner, when he brought his libel for divorce in January 1952, did charge adultery, but at the trial in February he abandoned this ground and sought a divorce only by reason of intolerable severity.    No finding of adultery was made by the court. Moreover, the petitioner abandoned any attempt to have the custody of the minor children awarded to him.    Instead, he stipulated that the child here in question might be given to the

mother.   In confirmation of this the petitioner has testified in open court that he consented to this arrangement and it is apparent that he did so with the same knowledge of the then existing conditions which he now has and which he urges as a part of his case in connection with his petition for change of custody.   This is a petition which he has not seen fit to bring until some five or more years have elapsed since the origin of his difficulties.   Added to all this is the finding of the trial court that the petitioner, Mr. McKinney, "at least for the present is dependent upon the good graces of Dr. Fletcher." We interpret this finding as expressing a doubt as to whether a child's economic security would be benefitted by a change to his father's custody since the finding goes on to say, "no evidence was introduced by the libellant as to his financial circumstances nor his present earnings or earning capacity."   Obviously, here was an important factor bearing on the question of custody entirely different from anything in the Raymond case.   It is because of the infinite variety of facts and factors that questions such as the one involved here have to be left to the discretion of the trial court.   True it is that "It is the essence of all law that when the facts are the same the result is the same."   *Hubbard* v. *Hubbard*, 77 Vt 73, 77, 58 A 969, 67 LRA 969, 970.   But here there was no identity of facts as trial court's findings show.

In his comparison of the two cases the petitioner seeks to escape this barrier by going behind the facts found— that is, into the evidence.   He reviews it in great detail and concludes there was more of it in his favor here and hence a stronger case against the wife than in *Raymond* v. *Raymond*. The Raymond case, he asserts, presented only "one isolated instance from which adultery could be inferred."   Here, he argues, the evidence is spread over five instances—and he enumerates them in detail—and yet in spite of this "five-fold" superiority, he complains, no adultery is found and the mother is allowed to retain her child.   On this point the Raymond case should help the petitioner to understand how it is that the decision went against him.   We there pointed out that it was for the trial court to say whether or not it would infer adultery

from the evidence before it, be there one instance or more. "Episodes", we said, "like witnesses are to be weighed and not counted." Thus, in no sense can it be said that this case is in conflict with the Raymond case. Far from being so, it is entirely loyal to it and the reasoning underlying it. In the Raymond case the father came to this court with the findings in his favor with evidence tending to support them; here the findings were against the petitioner. The weight of the evidence was for the trial court and its findings are not for revision here. *Platt* v. *Shields and Conant*, 96 Vt 257, 271, 119 A 520.

Under what the petitioner calls point "2", he continues to compare evidence, having moved on to the matter of housekeeping. On their facts in this regard, he sees an irreconcilable conflict between the decision here and in the Raymond case. The trial court found that although housework might not appeal to Mrs. McKinney as much as some, there was no serious grievance with respect to it. What the Raymond case stands for in this regard is that a mother who leads her children into ways not consistent with their welfare can not hope to hold her children merely because the menial aspects of housekeeping are adequately performed by her. No inconsistency appears; the cases are complementary rather than in opposition.

Petitioner's point "3" concerns the statement in the opinion above that there was an indication that the boy had no wish to be taken from his mother and "convincing evidence to the contrary was required if the petitioner wished to establish otherwise." This statement, the petitioner argues, is "precisely contrary" to the holding of the Raymond case wherein we stated that the welfare of the child was paramount and that "to that welfare, the rights, claims and personal desires of the parents, and even the wishes of the child, if opposed to that object, must yield." The trouble with the petitioner's argument is that here by the findings of the trial court the wishes of the child were not opposed to that object. In oral argument the petitioner seemed to assume that by our holding in the Raymond case, the wishes of the child are never to be considered. This is not correct. There might be a case where the child's welfare might be equally served by the custody of either parent. If this were so, the child's wishes might well be a

determinative factor. If the petitioner thought that this was the situation here, the opportunity was his to make out such a case as he could, for it is only where the child's wishes are opposed to his own welfare, that such wishes must yield. No conflict with the Raymond case appears.

Points "4" and "5" of the petitioner's motion overlap and are somewhat generalized. Their chief focus seems to be on our citation from *Miller* v. *Miller*, 89 Vt 547, 549, 95 A 928, from which we quoted as follows: "A court or jury is not bound *in all circumstances* (emphasis supplied) to believe testimony not directly contradicted." Such a statement, the petitioner argues, is in conflict with what was later held in *Lapierre* v. *Halpin*, 111 Vt. 193, 196, 13 A2d 281. Actually in *Lapierre* v. *Halpin*, *supra*, this Court was careful to distinguish the holding there made from that in the Miller case and in doing so approved the holding of the latter. What the petitioner fails to take into consideration is the fact that at the time of his divorce he relinquished the custody of his child to the mother with full knowledge of the existing circumstances and thereafter he allowed some five years to elapse from the time of the origin of his difficulties before seeking custody of his child. The petitioner's entire testimony, although uncontradicted, was to be weighed in the light of this delay. The extent to which one's conduct may discredit one's testimony is a matter for the trial court to determine. It is just at this point that *Miller* v. *Miller*, *supra*, becomes important and proper in such a case as this.

The petitioner's misconception, we fear however, reaches greater depths. There is a good deal in his brief to indicate that he regards this matter altogether too much like a default in a collection suit. The mother has not appeared to contest the petitioner's claim. It follows, he seems to think, that a judgment order should issue in his favor, almost as a matter of course, where his case is not contested. But this is not a mere contest of property rights between two parties. We have a third human being involved here. The welfare of a child is not a matter of default. By reason of this fact it was particularly incumbent on the court to weigh and evaluate

the evidence with utmost care. The court's overall conclusion will not be disturbed by us unless the record discloses that the discretion of the trial court was exercised on grounds, or for reasons, clearly untenable, or to an extent clearly unreasonable. *Houran* v. *Preferred Accident Ins. Co.*, 109 Vt 258, 270, 195 A 253.

By a supplement to his motion for reargument, the petitioner claims that in applying the rule of *Miller* v. *Miller, supra,* we have permitted the trial court to arbitrarily disregard uncontradicted evidence and to decide a case "in accordance with its own arbitrary predisposition" and that in doing so this is a plain denial of the right guaranteed the petitioner by the Fourteenth Amendment to the United States Constitution. That there was no such arbitrary disregard of the petitioner's evidence and that this Court by its decision said nothing to authorize that sort of thing may be readily gathered from what we have stated earlier. Clearly this case has been determined under the established decisions of this Court. There is no merit in the petitioner's contention.

The petitioner has asked that this case may be remanded in order to prevent a failure of justice pursuant to *Shea* v. *Pilette*, 108 Vt 446, 455, 189 A 154, 109 ALR 933. The petitioner has not specified any particular reason why this should be done. We know of none and hence have no basis for taking such action.

We have now considered all of the grounds of the petitioner's motion and have discovered no reason for reargument. We have dealt at length with each of his contentions to the end that we might help him to understand what actually enters into this Court's disposition of the matter. Our hope in this regard, however, is somewhat restrained. In primarily basing his motion for reargument on a comparison of evidence in two cases, the petitioner has disclosed a basic misconception in his approach to the whole problem. We are dealing here with the findings of a trial court and its exercise of discretion. We can not substitute ourselves for the lower court; the weight of the evidence is not for us to pass upon, nor can we overturn the action of the trial court unless, as we have stated, the discretion of that court was exercised on grounds, or for reasons, clearly

untenable, or to an extent clearly unreasonable. This is all made manifest by the cases we have cited. In both this and the Raymond case we affirmed because no such abuse of discretion was shown.

We might have disposed of the petitioner's motion in the apt and terse language of *Colby's Executor* v. *Poor*, 115 Vt 147, 154, 55 A2d 605, but we have made the more extended endeavor in an earnest attempt, by further exposition, to make all clear and plain.

*Motion for Reargument denied. Let full entry go down.*